UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN BRADFIELD,

    Plaintiff,

vs.

PERRY DARE, et al.,

    Defendants.
_____/

Civil Action No.
06-CV-10531-DT

HON. BERNARD A. FRIEDMAN

# OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) AS TO FIFTH AMENDMENT, FOURTEENTH AMENDMENT, MICHIGAN CONSTITUTION, FALSE IMPRISONMENT, AND GROSS NEGLIGENCE
### and
## DENYING SUMMARY JUDGMENT AS TO FOURTH AMENDMENT, ASSAULT, AND BATTERY

This matter is presently before the Court on Defendants' Motion for Summary Judgment.[1] Plaintiff has filed a Response. Defendant Corey Bauman has filed a Reply. The Court has had the opportunity to review the pleadings, motion and all relevant documents in this case. Pursuant to E.D. Mich. LR 7.1(e)(2), the Court shall decide the motion without oral argument. The Court will grant summary judgment in part and deny summary judgment in part.

## I.  HISTORY OF THE CASE

### A.  FACTUAL BACKGROUND

Jonathan Bradfield ("Plaintiff") is a 19-year-old Detroit resident. (Pl.'s Resp., Ex. B at

---

[1] Although all four Defendants filed the Motion for Summary Judgment, the parties have since stipulated to the dismissal of three Defendants. Therefore, Defendant Corey Bauman is the only remaining Defendant.

6.) Plaintiff alleges that he was the victim of excessive force by police. Defendants are four law-enforcement officers: Corey Bauman ("Defendant Bauman"), a City of Southfield police officer; Perry Dare ("Defendant Dare"), an Oakland County Sheriff's deputy; Pete Simerly ("Defendant Simerly"), a City of Southfield police officer; and Sean Stoner ("Defendant Stoner"), an Oakland County Sheriff's deputy.

On the snowy night of March 23, 2005, Defendants Dare and Bauman were working with a confidential informant to conduct an undercover drug bust. (Def.'s Br. Supp. Mot., 2; Pl.'s Br. Supp. Resp., 4.) It had been arranged that Defendants Dare and Bauman would pay $35,000 for 30 pounds of marijuana. (Def.'s Br. Supp. Mot., 2; Pl.'s Br. Supp. Resp., 4.) The seller was an individual known as "Q."[2] (Def.'s Br. Supp. Mot., 2; Pl.'s Br. Supp. Resp., 4.) "Q" was accompanied by an individual known as "J-Rod."[3] The marijuana-money exchange was supposed to take place in a neighborhood, but Defendants Dare and Bauman moved the location of the exchange to a public parking lot near a Rite Aid drugstore because they feared that they were being set up to be robbed. (Def.'s Br. Supp. Mot., 2 and Ex. C at 23-31.)

Later, in the parking lot, "Q" and "J-Rod" showed a one-pound sample of marijuana to Defendants Dare and Bauman. After seeing the sample, Defendants Dare and Bauman alerted Defendant Simerly, who was in a nearby surveillance vehicle. (Id. at 2-3; Pl.'s Br. Supp. Resp., 4.) However, "Q" and "J-Rod" drove their car out of the parking lot, eluded the surveillance vehicles, and sped down the street. (Def.'s Br. Supp. Mot., 3; Pl.'s Br. Supp. Resp., 4.) Their

---

[2]The real name of "Q" is Quinton Cummings. (Def.'s Mot., Ex. C at 19; Pl.'s Br. Supp. Resp., 4 n.1.)

[3]The real name of "J-Rod" is Laren Riley (Def.'s Mot., Ex. C at 21.)

2

escape, though, was short-lasted, because they crashed their car about two blocks from the parking lot. (Def.'s Br. Supp. Mot., 3; Pl.'s Br. Supp. Resp., 4.) "Q" and "J-Rod" fled on foot. (Def.'s Br. Supp. Mot., 3; Pl.'s Br. Supp. Resp., 4.) "Q" was soon apprehended, but "J-Rod" got away. (Def.'s Br. Supp. Mot., 3.)

Defendants Dare and Bauman, who were in an unmarked black pickup truck, (Def.'s Mot., Ex. C at 21), drove through the area in search of "J-Rod." (Def.'s Br. Supp. Mot., 3.) "J-Rod" is a six-foot tall black male, with a slim build of about 160 to 170 pounds, and a small amount of facial hair. That night, he was wearing a black cap, a black coat, and black pants. (Def.'s Mot., Ex. C at 22.)

At the same time as these events were unfolding, Plaintiff was leaving his parents' house and was walking to a nearby store to purchase some candy. (Pl.'s Br. Supp. Resp., 4.) Plaintiff, a black male, was 16 years old and was wearing white-and-black jogging pants, a black coat, and a black hat. (Pl.'s Br. Supp. Resp., 4 and Ex. B at 35.)

As Defendants Dare and Bauman continued their search of the area, they came across Plaintiff, but they thought that he was "J-Rod." (Def.'s Br. Supp. Mot., 3.) Defendants Dare and Bauman radioed Defendant Simerly, who drove to the location where Defendants Dare and Bauman had spotted Plaintiff. (Id. at 3-4.) Like Defendants Dare and Bauman, Defendant Simerly was also driving an unmarked vehicle. (Def.'s Mot., Ex. D at 29-30.) Defendant Simerly states that he drove up alongside Plaintiff, but Plaintiff ran away after Defendant Simerly asked him to "stop." (Def.'s Br. Supp. Mot., 4 and Ex. D at 30-31.) According to Plaintiff, he ran because Defendant Simerly's unmarked vehicle was slowly "creeping" along behind him, and he thought that there may be gang members inside the vehicle. (Pl.'s Resp., Ex.

3

B at 44-54.) Defendant Simerly states that he never identified himself as a police officer, but he was wearing a black jacket that had the word "POLICE" written on it in white letters. (Def.'s Br. Supp. Mot., 4 and Ex. D at 30.) Plaintiff, though, states that he could not see inside the vehicle. (Pl.'s Resp., Ex. B at 47.)

As Plaintiff ran away from Defendant Simerly's vehicle, Plaintiff came across Defendant Bauman, who had gotten out of his vehicle. (Def.'s Br. Supp. Mot., 4; Pl.'s Br. Supp. Resp., 5.) Plaintiff states that he thought Defendant Bauman was a "biker" or a "crackhead." (Pl.'s Br. Supp. Resp., 5 and Ex. B at 56-57.) Plaintiff states that Defendant Bauman yelled: "I'm gonna shoot you, little mother fucker. I'm gonna shoot you. I'm gonna kill you." (Pl.'s Br. Supp. Resp., 5 and Ex. B at 58-60.) Plaintiff states that Defendant Bauman yelled "stop" when Plaintiff continued to run. (Pl.'s Resp., Ex. B at 58-59.) Defendant Bauman admits that he was not wearing a police uniform, but he asserts that he was wearing his police badge around his neck and that he only yelled "stop, police." (Def.'s Br. Supp. Mot., 4 and Ex. B at 57.)

When Plaintiff continued to run, Defendant Bauman chased him. (Id. at 4; Pl.'s Br. Supp. Mot., 5.) According to Plaintiff, during the chase, Defendant Bauman continued to yell that he was going to "shoot" and "kill" Plaintiff. (Pl.'s Resp., Ex. B at 58-62.) Plaintiff assumed that Defendant Bauman had a gun. (Pl.'s Br. Supp. Resp., 5.) Plaintiff continued to run and ended up in an alley that was blocked by a fence. (Def.'s Br. Supp. Mot., 4; Pl.'s Br. Supp. Resp., 5.) Plaintiff started to climb the fence. (Def.'s Br. Supp. Mot., 4; Pl.'s Br. Supp. Resp., 5.)

According to Defendant Bauman, he tackled Plaintiff after Plaintiff jumped back down from the fence. (Def.'s Mot., Ex. B at 52-54.) Defendant Bauman states that he had to get on

4

top of Plaintiff because Plaintiff was "struggling violently" and not complying with his instructions. (Id. Ex. B at 59-60.) Defendant Bauman states that he told Plaintiff to "chill out" because "we're cops," but Plaintiff continued to resist. (Id. Ex. B at 60.) Defendant Bauman states that he kneed Plaintiff in the mid-thigh section of his leg in order to subdue him. (Id. Ex. C at 62.) Defendant Bauman states that Plaintiff eventually stopped resisting when he "ran out of energy." (Id. Ex. B at 60.) Defendant Bauman states that he did not, at any time, knee Plaintiff in the face. (Id. Ex. C at 64.) Moreover, Defendant Bauman states that Plaintiff only suffered "minor bleeding" from a cut on his lip that occurred when Plaintiff hit the ground after Defendant Bauman tackled him. (Id. Ex. B at 64-67.)

Plaintiff tells quite a different story. Plaintiff states that when he started climbing the fence, Defendant Bauman yelled—for the first time—"I'm a cop. I'm a cop." (Pl.'s Resp., Ex. B at 70.) At that point, Plaintiff states that he dropped down from the fence, put his hands up, and complied with Defendant Bauman's instructions to lay down. (Pl.'s Br. Supp. Resp., 6 and Ex. B at 70-73.) Plaintiff states that, at that point, Defendant Bauman pointed his gun at Plaintiff. (Pl.'s Br. Supp. Resp., 6.) Plaintiff describes what happened next:

> I said, "I didn't know you're a cop." He said, "Lay down." While I was laying down, I pointed to my house right behind – I'm like, "I live right over there."
> . . . .
> He ran up and dropped his right knee on my jaw, while his left knee went down on my back.
> . . . .
> After he dropped his knee on my face, he started like kneeing me – kneeing me in my jaw. And then I – I remember opening up my eyes. He did it like three or four times. And then I had my eyes closed. So once I opened up my eyes, the snow around me was just – like just red.
> . . . .
> [H]e already had his knee on my hands from when I had my hand

5

behind my back. So I can't move my hands. I couldn't move
pretty much at all. He was a heavy-set guy . . . .
. . . .
I was stunned at the time, so I don't – I didn't move, I mean. He
kneed me in my face. I – I mean, I was pretty much – like I said
before, I don't want to say lost consciousness, but . . . .
. . . .
I won't say I didn't [move at all when he was kneeing me], but I
didn't move like drastically, because he pretty much had my arms
pinned down, pretty much my whole chest was – I mean, he pretty
much had my whole torso in check.
. . . .
And the thing about it was after he kneed me, I kind of opened up
my eyes and saw the whole snow was just red.
. . . .
I just remember I couldn't move my hands. And then he was
kneeing me in my face. I can't tell you the exact position he was
in, because I couldn't even see him. I just know he was on my
back.
. . . .
[O]nce he kneed me, the picture that was in my head, that my jaw
was just – I thought he had just like – just destroyed my jaw. But
once he brought his knee up from that first time, I kind of – I kind
of like felt like it was some teeth – like it was some pieces of my
teeth were in my mouth, because it was like hurting my tongue, so
then I'm like, okay, maybe my jaw isn't broken, maybe it's just a
tooth. So then he kneed me the three more times.
. . . .
Every time he hit me, I pretty much blinked. I mean, every time it
went down, I mean, my eyes – I closed my eyes.
. . . .
And once I opened up my eyes, I was just – it was just blood
everywhere. So what I said was, "I'm bleeding." He kneed me [in
the jaw] two more times and told me to shut up.
. . . .
I pretty much stayed still, because after that it was – I was pretty
much just in shock. And, I mean, the dude had already – I mean, if
he could do that to me, I mean, what else? I mean, I know what
went through my head. I know I started praying . . . .
. . . .

(Pl.'s Resp., Ex. B at 76-86.)

At that point, Defendant Simerly arrived at the scene on foot, but he was on the other side

of the fence than Plaintiff and Defendant Bauman.  (Def.'s Br. Supp. Mot., 6; Pl.'s Br. Supp. Resp., 7.)  Defendant Simerly states that it was "dark," but that he could see that Defendant Bauman was on top of Plaintiff, and that Plaintiff was "struggling" and "kept getting up off the ground."  (Def.'s Mot., Ex. D at 36-38.)  Defendant Simerly states that Defendant Bauman asked him for handcuffs because Defendant Bauman did not have his handcuffs, so Defendant Simerly returned to his car to retrieve a set of handcuffs.  (Id. Ex. D at 38-39.)

In the meantime, Defendant Dare came up to Plaintiff and Defendant Bauman.  Defendant Dare states that Plaintiff was "[f]lailing his arms" and "trying to get away from" Defendant Bauman.  (Id. Ex. C at 73.)  Defendant Dare states that Defendant Bauman was trying to keep Plaintiff on the ground, was "giving him orders to get on the ground," and was yelling "police."  (Id. Ex. C at 74.)  Defendant Dare had a pair of handcuffs, and he handcuffed Plaintiff.  (Id.)  Defendant Dare also pulled Plaintiff's hat down over his eyes, so that Plaintiff would not see any of the other undercover officers.  (Id. Ex. C at 75-76.)  Defendants Dare and Bauman then walked Plaintiff over to their vehicle.  (Def.'s Br. Supp. Mot., 6.)  At this point, Defendant Dare and Bauman still believed that Plaintiff was "J-Rod."  (Def.'s Br. Supp. Mot., 6 and Ex. B at 69-70.)

As before, Plaintiff tells a different story.  Plaintiff states that when Defendant Simerly approached from the other side of the fence, he had a flashlight and shined it in Plaintiff's eyes.  (Pl.'s Resp., Ex. B at 89-90.)  While this was happening, Plaintiff states that Defendant Bauman kneed him two more times in the jaw and told him, several times, to "[c]lose your eyes" and "[s]top looking."  (Id. Ex. B at 89-91.)  Plaintiff states that Defendant Bauman had his gun pressed against the side of Plaintiff's head, although Plaintiff admits that he only felt the tip of

7

the gun but did not actually see the gun. (Id. Ex. B at 100-101.) Plaintiff states that Defendant Bauman asked Defendant Simerly for handcuffs. (Id. Ex. B at 90.) Plaintiff states that Defendant Bauman also said, "If he move[s], I'm gonna kill him." (Id. Ex. B at 91.) Plaintiff describes his thoughts at the time: "[I]f I move, I'm pretty much dead, so I just started praying at the time." (Id. Ex. B at 93.) Lastly, Plaintiff states that Defendant Bauman asked him about the "pound" of marijuana; but Plaintiff states that he explained to Defendant Bauman that he didn't know what Defendant Bauman was talking about, that Plaintiff was not involved with drugs, and that Plaintiff had been walking to the store to buy some candy. (Id. Ex. B at 93, 97-98.) Plaintiff states that Defendant Bauman responded, "If you don't tell me where the pound at, I'm gonna take you back there and beat you up some more." (Id. Ex. B at 97.)

After Plaintiff was placed in Defendants Dare and Bauman's undercover vehicle, a uniformed officer was called to transport Plaintiff to the jail. (Def.'s Br. Supp. Mot., 6.) However, after reviewing Plaintiff's identification, the uniformed officer discovered that Plaintiff was only 16 years old. (Id. at 6-7.) As a minor, Plaintiff could not be taken to the jail, so the officers released him to go home. (Id. at 7.)

### B. PROCEDURAL HISTORY

In November 2005, Plaintiff filed a Complaint in Wayne County Circuit Court. On February 7, 2006, Defendants removed the case to this Court, based on federal-question jurisdiction. The Complaint was originally filed by Jacqueline Taylor, as next friend of Plaintiff, who was a minor at that time. In September 2006, the parties stipulated to amend the caption of the Complaint in order to remove Taylor's name because Plaintiff was no longer a minor.

On February 1, 2007, Defendants filed a Motion for Summary Judgment. On February

22, 2007, Plaintiff filed a Response. On March 6, 2007, the parties stipulated to dismiss the cause of action as to Defendants Dare, Simerly and Stoner. On March 8, 2007, Defendant Bauman filed a Reply.

A motion hearing was scheduled for April 18, 2007; however, on April 9, 2007, the Court adjourned the hearing and notified the parties that the summary-judgment motion would be determined on the briefs.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When reviewing a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A "genuine" issue is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The court must view all of the evidence in the record, as well as any reasonable inferences from that evidence, in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B.  COUNT I—GROSS NEGLIGENCE, INTENTIONAL, WILLFUL AND WANTON MISCONDUCT

In Count I, Plaintiff asserts a claim of gross negligence against Defendant Bauman. The Michigan Compiled Laws define "gross negligence" as "conduct so reckless as to demonstrate a

substantial lack of concern for whether injury results." MICH. COMP. LAWS ANN. § 691.1407(7)(a) (West Supp. 2007). Although Plaintiff has characterized Count I as being a claim for gross negligence, Plaintiff's claim is clearly premised on his assertions of intentional torts, such as assault and battery, and excessive force.[4] However, the Michigan Court of Appeals has explained that "this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." Vanvorous v. Burmeister, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004). See also Livermore v. Lubelan, 476 F.3d 397, 408 (6th Cir. 2007) (same). Therefore, the Court will grant summary judgment as to Plaintiff's claim of gross negligence.

C. **COUNT II—EXCESSIVE USE OF FORCE**

In Count II of his Complaint, Plaintiff alleges that Defendant Bauman's excessive use of force violated—pursuant to 42 U.S.C. § 1983[5]—his rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and under Article 1, Section 2 of the Michigan

---

[4]In Defendant Bauman's Motion for Summary Judgment, Defendant Bauman states: "Plaintiff's claims against all of the Defendants center on the alleged use of excessive force." (Def.'s Mot. ¶ 3.) In his Response, Plaintiff admits that Defendant's statement is correct. (Pl.'s Resp. ¶ 3.)

[5]Title 42 U.S.C. § 1983 states:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2003). A sufficient claim for a violation of Section 1983 must show that: "(1) a person, (2) acting under the color of state law, (3) deprived him of a federal right." Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003).

Constitution. (Pl.'s Compl. ¶ 26.)

Although Plaintiff alleges that Defendant Bauman violated several of his federal constitutional rights, the United States Supreme Court has held that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). Therefore, Plaintiff's claims of constitutional violations should be addressed exclusively under the "reasonableness standard" of the Fourth Amendment. Therefore, Defendant Bauman is entitled to summary judgment as to Plaintiff's claims for violations of the Fifth and Fourteenth Amendments.

In addition, the Michigan Supreme Court has held that there is "no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against . . . an individual government employee." Jones v. Powell, 612 N.W.2d 423, 426 (Mich. 2000). Instead, a "plaintiff may bring an action against an individual defendant under § 1983 and common-law tort theories." Id. at 427. The Eastern District of Michigan has similarly dismissed state constitutional claims against individual governmental employees when a plaintiff has "another avenue of relief," such as "an action under 42 U.S.C. § 1983." HRSS, Inc. v. Wayne County Treasurer, 279 F. Supp. 2d 846, 851 (E.D. Mich. 2003). Therefore, Defendant Bauman is entitled to summary judgment as to Plaintiff's claim for a violation of the Michigan Constitution.

As summary judgment will be granted as to Plaintiff's claims under the Fifth and Fourteenth Amendments and the Michigan Constitution, Count II of the Complaint is left with only a Section 1983 claim for a violation of the Fourth Amendment. A claim of excessive force,

under the Fourth Amendment, is analyzed under an objective reasonableness standard. Graham, 490 U.S. at 395-97. In Graham, the Supreme Court explained the inquiry:

> [I]ts proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
> . . . .
> [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Id. at 396-97 (citations omitted).

Here, the Court finds that there is a factual dispute as to whether Defendant Bauman's actions were reasonable at the time. Plaintiff alleges that Defendant Bauman did not initially identify himself as a police officer and repeatedly screamed that he was going to shoot and kill Plaintiff. When Defendant Bauman identified himself as a police officer, Plaintiff alleges that he immediately submitted, laid down, and did not resist. In spite of his compliance, Plaintiff alleges that Defendant Bauman repeatedly kneed Plaintiff in the jaw, held a gun to Plaintiff's head, and

told him that he would kill Plaintiff if Plaintiff moved. When the factual allegations are taken in the light most favorable to Plaintiff, Defendant Bauman's actions were not objectively reasonable, as a reasonable officer would know that such force was not necessary in this situation. A reasonable officer would not have repeatedly kneed a suspect in the face after the suspect had complied with the officer's instructions and was lying face-down on the ground. A reasonable officer would not have threatened to shoot and kill the suspect in this situation. As such, there appears to be a factual dispute as to whether Defendant Bauman violated Plaintiff's rights under the Fourth Amendment.

However, even if Defendant Bauman violated Plaintiff's Fourth Amendment rights, Defendant Bauman argues that he is nonetheless protected by qualified immunity. In <u>Harlow v. Fitzgerald</u>, the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court laid out a two-prong test to determine whether a governmental actor is protected from liability by qualified immunity. The Sixth Circuit has described this two-part test as follows:

> The first prong is a threshold question, namely: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" If the answer is in the negative, then the inquiry ends. If a violation could be established, the second prong requires an examination of whether "the right was clearly established" at the time of the events at issue. In order for the right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." As the Court explained, "[t]he relevant dispositive inquiry in

> determining whether a right is clearly established is whether it
> would be clear to a reasonable officer that this conduct was
> unlawful in the situation he confronted."

Weaver v. Shadoan, 340 F.3d 398, 406-07 (6th Cir. 2003) (quoting Saucier, 533 U.S. at 201-02) (citations omitted).

When applying the two-prong test, the Supreme Court instructs that a court must remember that the qualified immunity analysis goes a dimension further than merely whether a governmental actor's conduct was objectively reasonable. In Saucier, the Supreme Court explained:

> The concern of the immunity inquiry is to acknowledge that
> reasonable mistakes can be made as to the legal constraints on
> particular police conduct. It is sometimes difficult for an officer to
> determine how the relevant legal doctrine, here excessive force,
> will apply to the factual situation the officer confronts. An officer
> might correctly perceive all of the relevant facts but have a
> mistaken understanding as to whether a particular amount of force
> is legal in those circumstances. If the officer's mistake as to what
> the law requires is reasonable, however, the officer is entitled to
> the immunity defense.

Saucier, 533 U.S. at 205.

Applying the two-prong test, and taking the evidence in the light most favorable to Plaintiff, the Court finds that Defendant Bauman is not entitled to qualified immunity. Defendant Bauman's conduct violated the constitutional rights of Plaintiff, as Plaintiff clearly had a constitutional right to be free from unreasonably excessive force. Defendant Bauman bloodied Plaintiff's face by continuing to knee him in the face after he had complied with Defendant Bauman's instructions. Furthermore, Plaintiff's rights were clearly established at the time of the incident. A reasonable officer would have known that his conduct was unlawful and violated Plaintiff's Fourth Amendment rights. For instance, a reasonable officer would have

known that it is unlawful to repeatedly knee a suspect in the head after that suspect has submitted and is lying face-down on the ground, irregardless of how frustrated or angry that officer may have been because of the preceding chase. Also, a reasonable officer, in this situation, would not have threatened a suspect with statements of impending death, such as "I'm gonna kill you" or "I'm gonna shoot you." Thus, when the allegations are taken in the light most favorable to Plaintiff, there is no qualified-immunity protection for Defendant Bauman.

In sum, the Court will grant summary judgment as to Plaintiff's claims for violations of the Fifth Amendment, Fourteenth Amendment, and Michigan Constitution. However, there is a factual dispute as to whether Defendant Bauman violated the Fourth Amendment. Thus, the Court will deny summary judgment as to Plaintiff's Section 1983 claim under the Fourth Amendment.

### D. COUNT III—ASSAULT AND BATTERY/FALSE IMPRISONMENT

In Count III, Plaintiff asserts that he was the victim of assault, battery and false imprisonment. The Michigan Court of Appeals has defined "assault" as "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." Smith v. Stolberg, 586 N.W.2d 103, 105 (Mich. Ct. App. 1998) (quoting Espinoza v. Thomas, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991)). The Michigan Court of Appeals has defined "battery" as "the wilful and harmful or offensive touching of another person which results from an act intended to cause such contact." Id.

When taking the factual allegations in the light most favorable to Plaintiff, the Court

finds that Plaintiff has sufficiently alleged the required elements for assault and battery. Defendant Bauman's actions could clearly have caused a "well-founded apprehension of imminent contact" and a "wilful and harmful or offensive touching." In Michigan, intentional torts such as assault and battery are generally not protected by governmental immunity, but the Michigan Court of Appeals has held:

> Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified. Conversely, if the actions are not justified, they are not protected by governmental immunity. Specifically, a police officer may use reasonable force when making an arrest. Therefore, the measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.

Brewer v. Perrin, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984) (citations and quotations omitted).

Here, when the evidence is taken in the light most favorable to Plaintiff, the Court finds that Defendant Bauman is not entitled to governmental immunity. Although an officer may use reasonable force to effectuate an arrest, a factual dispute exists as to whether Defendant Bauman's conduct was justified in this situation. For instance, according to Plaintiff, Defendant Bauman never identified himself as a police officer. When Defendant Bauman—who was not wearing a police uniform—finally identified himself as a police officer, Plaintiff submitted and laid face-down on the ground. Although Defendant Bauman reasonably believed that he had apprehended a drug dealer who had been trying to escape arrest, it was nevertheless unreasonable and unnecessary for Defendant Bauman—after Plaintiff had complied with his instructions—to repeatedly knee him in the face until blood ran out of Plaintiff's mouth. Moreover, Defendant Bauman yelled, several times, that he was going to "shoot" and "kill" Plaintiff. In this situation, Defendant Bauman's actions were not justified. Therefore, the Court

will deny summary judgment as to the claims for assault and battery.

However, the Court will grant summary judgment as to Plaintiff's claim for false imprisonment. For a valid claim of false imprisonment, "the elements . . . are '(1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of the confinement.'" Walsh v. Taylor, 689 N.W.2d 506, 514 (Mich. Ct. App. 2004) (quoting Moore v. Detroit, 652 N.W.2d 688, 691 (Mich. Ct. App. 2002)). In an arrest context, the "restraint must have occurred without probable cause to support it." Id. at 514. See also Brewer, 349 N.W.2d at 201 (stating "[i]n order to prevail on this count [of false imprisonment], plaintiff must show that the arrest was not legal, *i.e.*, without probable cause").

Here, Defendant Bauman reasonably thought that Plaintiff was "J-Rod." Plaintiff and "J-Rod" were both wearing dark clothes; Plaintiff was in close proximity to where the police last saw "J-Rod"; and Plaintiff ran from police when they approached him. As such, Defendant Bauman believed that he was chasing "J-Rod," a drug dealer who had just eluded police vehicles, crashed his car, and was now trying to escape from police on foot. In fact, it was not until several days after the incident that Defendant Bauman actually learned that Plaintiff was not "J-Rod." (Def.'s Mot., Ex. B at 83.) Moreover, Plaintiff does not assert that there was no probable cause to apprehend Plaintiff. Thus, the Court finds that there was probable cause to apprehend Plaintiff, and the Court will grant summary judgment as to Plaintiff's claim of false imprisonment.

Furthermore, in his motion, Defendant Bauman asserts that Plaintiff's inclusion of the false-imprisonment claim was a clerical mistake, and that the claim was not intended to be included in the Complaint. (Def.'s Br. Supp. Mot., 16 n.7.) In his Response, Plaintiff offers no

17

response to Defendant Bauman's assertion. In fact, Plaintiff's Response does not address the false-imprisonment claim at all. Thus, the Court finds that Plaintiff himself seems to tacitly admit that his false-imprisonment claim is a failure.

In sum, the Court will grant summary judgment as to Plaintiff's false-imprisonment claim. However, the Court will deny summary judgment as to Plaintiff's claims for assault and battery.

## III.   CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part Defendant Bauman's Motion for Summary Judgment. In particular, the Court will grant summary judgment as to Plaintiff's claims for violations of the Fifth and Fourteenth Amendments of the United States Constitution, and the claim for a violation of the Michigan Constitution. The Court will also grant summary judgment as to the state-law claims for false imprisonment and gross negligence. On the other hand, the Court will deny summary judgment as to Plaintiff's Section 1983 claim for use of excessive force, in violation of the Fourth Amendment. In addition, the Court will deny summary judgment as to Plaintiff's state-law claims for assault and battery.

Accordingly,


IT IS ORDERED that Defendant's Motion for Summary Judgment is granted as to Plaintiff's claim for gross negligence (Count I); Plaintiff's claims for violations of the Fifth Amendment, Fourteenth Amendment, and Michigan Constitution (Count II); and Plaintiff's claim of false imprisonment (Count III).


IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is

18

denied as to Plaintiff's Section 1983 claim for use of excessive force in violation of the Fourth Amendment (Count II) and Plaintiff's claims of assault and battery (Count III).


       \_\_s/Bernard A. Friedman_____
       BERNARD A. FRIEDMAN
       CHIEF UNITED STATES DISTRICT JUDGE

Dated: May 15, 2007
      Detroit, Michigan

**I hereby certify that a copy of the foregoing document was served this date upon counsel of record electronically and/or via first-class mail.**

_____**/s/ Patricia Foster Hommel**_____
      **Patricia Foster Hommel**
    **Secretary to Chief Judge Friedman**